UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

Plaintiffs,

-against-

NAJIB ALLAM and MANUEL CHANG,

Defendants.

MEMORANDUM & ORDER
18-CR-00681 (NGG) (ST)

NICHOLAS G. GARAUFIS, United States District Judge.

Defendants Manuel Chang ("Defendant" or "Chang") and Najib
Allam ("Defendant" or "Allam") move to dismiss the indictment
against them on the grounds that their constitutional and statu-
tory rights to a speedy trial have been violated due to the
Government's delay in prosecuting them.

On December 29, 2018, Chang was arrested while on a layover
in South Africa before returning to his home country of Mozam-
bique. Less than a month later, the United States of America (the
"Government") submitted a request to South Africa seeking
Chang's extradition to the United States to face an indictment
charging Chang with wire fraud, securities fraud, and conspiracy
to commit money laundering. On July 12, 2023, approximately
four and a half years following his arrest, Chang was finally ex-
tradited to the United States. On August 8, 2023, Chang moved
to dismiss the indictment on speedy trial grounds. (*See* Chang
Not. of Mot. to Dismiss (Dkt. 480); Chang Mem. in Supp. of Mot.
to Dismiss ("Chang Mot.") (Dkt. 481).)

Allam is still in Lebanon and his counsel submits the instant mo-
tion on his behalf, alleging that the Government's failure to
secure Allam's presence to stand trial in the United States is in
violation of his speedy trial rights. (*See* Allam Not. of Mot. to Dis-
miss (Dkt. 484); Allam Mem. in Supp. of Mot. to Dismiss ("Allam

Mot.") (Dkt. 485).) The Government opposes both motions. (*See* Gov't Opp. (Dkt. 496).)

For the reasons set forth below, both motions are DENIED.

## I.   BACKGROUND

On December 19, 2018, the Government filed a four-count sealed indictment charging Chang, Allam, and others in connection with a $2 billion dollar fraud, bribery, and money laundering scheme. (*See* Initial Indictment (Dkt. 1); Superseding Indictment ("Indictment") (Dkt. 137).)[1] The Indictment charges both Allam and Chang with three of the four counts: Conspiracy to Commit Wire Fraud, in violation of 18 U.S.C. § 1349 (Count I); Conspiracy to Commit Securities Fraud, in violation of 18 U.S.C. § 371 (Count II); and Conspiracy to Commit Money Laundering, in violation of 18 U.S.C. § 1956(h) (Count IV). (Indictment ¶¶ 95-99, 103-04.)

### A.   Factual Background Relating to the Indictment

As alleged in the Indictment, Chang and Allam, along with their co-defendants and other unnamed co-conspirators, engaged in a fraudulent scheme to divert over $200 million dollars in bribes and kickbacks to themselves, Mozambican government officials, and others. (*Id.* ¶ 25.) The scheme involved three Mozambican state-owned entities: Proindicus, S.A. ("Proindicus"), Empresa Moçambicana de Atum, S.A. ("EMATUM"), and Mozambique Asset Management ("MAM"). (*Id.* ¶ 2.) These companies were purportedly created to undertake three maritime projects "for and behalf of Mozambique." (*Id.*) Proindicus was to perform coastal surveillance, EMATUM was to engage in tuna fishing, and

---

[1] The Government filed a Superseding Indictment on August 16, 2019 (*See* Dkt. 137.) All references and citations are to the Superseding Indictment unless otherwise noted.

MAM was to build and maintain shipyards. (*Id.*) All three companies contracted with the Privinvest Group, a holding company based in Abu Dhabi, United Arab Emirates, to complete the maritime projects for Mozambique. (*Id.* ¶¶ 9, 25.) At all times relevant to the Government's charges, Allam was the Chief Financial Officer ("CFO") of Privinvest. (*Id.* ¶ 11.)

Between 2013 and 2016, Proindicus, EMATUM, and MAM borrowed over $2 billion through loans arranged by two investment banks. (*Id.* ¶ 24.) However, "little [to] no business activity" was conducted on the maritime projects. (*Id.* ¶ 26.) Instead, only a "portion" of the loan proceeds went toward the projects whereas more than $200 million was diverted to the Defendants and others for personal enrichment. (*Id.* ¶ 25.) The Mozambican government guaranteed these loans.[2] (*Id.* ¶ 24.) Between 2013 and 2014, Chang served as Mozambique's Minister of Finance and signed the Mozambique Government guarantee for a Proindicus loan and a related increase in the borrowing amount for this loan, (*id.* ¶¶ 3, 31, 54), the EMATUM loan, (*id.* ¶ 59), and the MAM loan. (*Id.* ¶ 81.) The Indictment alleges that, in return for his involvement, Chang received at least $5 million in bribes and kickback payments from Privinvest, including from its CFO, Allam. (*Id.* ¶¶ 39, 92(a).)

Between May 2016 and March 2017, all three companies defaulted on their loans and missed more than $700 million in payments resulting in a devastating hit to the Mozambican economy. (*Id.* ¶ 91.; Gov't Opp. at 2-3.)

---

[2] The loans were arranged by two banks that sold interests in the loans to investors, including investors in the United States, by investment sales. (*Id.* ¶¶ 24, 27.)

**B.  Factual Background Relating to the Motions to Dismiss**

1.  Chang's Motion

Chang, Allam, and their co-defendants were indicted under seal by a grand jury in the Eastern District of New York on December 19, 2018. (*See* Initial Indictment.) Shortly after the Initial Indictment, the Government requested a provisional arrest warrant ("PAR") with the Department of Justice's ("DOJ") Office of International Affairs ("OIA") to "intercept Chang in South Africa, before he reached his home of Mozambique" for purposes of international extradition through treaty-based diplomatic channels. (Jeffrey M. Olson Declaration in Support of Opposition to Chang Mot. to Dismiss ("Olson Chang Decl.") (Dkt. 496-2) ¶ 21.) The United States does not have an extradition treaty with Mozambique and many countries do not extradite their own citizens without such a treaty. (*Id.*) This led the Government to submit the PAR in South Africa, where Chang was traveling, because the United States does have an extradition treaty with South Africa. (*Id.*)

Two days after the Initial Indictment, on December 21, 2018, OIA presented the PAR to South Africa. (*Id.* ¶ 22.) Chang was subsequently arrested at O.R. Tambo International Airport in Johannesburg, South Africa on December 29, 2018. (*Id.* ¶ 23.) Pursuant to the treaty between the United States and South Africa, Chang's provisional arrest triggered a 60-day deadline for the United States to submit a full extradition request with supporting documents to South Africa. (*Id.* ¶¶ 7, 24.) On January 28, 2019, approximately one month ahead of the deadline, the United States via the State Department submitted a formal extradition request seeking Chang's extradition from South Africa. (*Id.* ¶ 24.)

Four days later, on February 1, 2019, the Government of Mozambique submitted its own extradition request to South Africa for

Chang's extradition to Mozambique. (*Id.* ¶ 25.) The two competing requests spurred a series of litigation proceedings before the South African judiciary that lasted four and a half years, during which time Chang remained incarcerated in South Africa. (Gov't Opp. at 4.)

On May 21, 2019, South Africa's then-Minister of Justice, Michael Masutha, decided that Chang should be extradited to Mozambique. (Olson Chang Decl. ¶¶ 30, 34.) United States diplomatic officials, through the U.S. Embassy in Pretoria, sought reconsideration, including, in June 2019, in a meeting with the new Minister of Justice, Ronald Lamola. (*Id.* ¶¶ 35-37; Gov't Opp. at 4.) Around the same time, Chang brought an application in the High Court of South Africa against Minister Lamola seeking immediate transfer to Mozambique or release on bail. (*Id.* ¶ 38.)

Between July and August 2019, two "civil society organization[s]" brought suits in South African courts contesting former Minister Masutha's decision to extradite Chang to Mozambique. (*Id.* ¶ 39.) At no point during these litigation proceedings did the United States intervene as a party to the litigation, though it did retain local counsel in South Africa "to monitor the litigation and provide updates to OIA on the proceedings." (*Id.* ¶ 41.)

On November 1, 2019, the High Court ruled that former Minister Masutha improperly determined that Chang should be sent to Mozambique. (Christiaan Frederick Krause Declaration in Support of Chang's Mot. to Dismiss ("Krause Decl.") (Dkt. 483) ¶ 9; Ex. D to Krause's Decl., Excerpts of *Chang I* Decision ("*Chang I* Excerpts") (Dkt. 483-4) at 23 para. 80; Chang Mot. at 4-5.) The decision noted that Chang could not be prosecuted in Mozambique "because this was prohibited by his immunity" as a then-Member of Parliament and that it would be "irrational for a person to be extradited so they could be prosecuted for their crimes if they were immune from prosecution for such crimes." (*Chang I* Excerpts at 23 para. 80.) Further, the court held that Minister

Masutha was unaware of Chang's immunity from prosecution. (*Id.*) This ruling invalidated the previous extradition order, and the High Court returned the case to Minister Lamola for decision. (Krause Decl. ¶ 9.) The Government contends that it requested several updates throughout 2020, but Minister Lamola did not return a decision until August 17, 2021, when he decided, in line with his predecessor, to extradite Chang to Mozambique. (Gov't Opp. at 5 (citing Olson Chang Decl. ¶¶ 44-49).)

Following the decision, the Mozambique-based civil society organization immediately filed a motion to stay Chang's extradition to Mozambique to challenge Minister Lamola's decision. (Olson Chang Decl. ¶ 51.) South Africa granted the stay until the organization's argument could be heard. (*Id.*) On December 7, 2021, the High Court held that the decision to extradite Chang to Mozambique was unconstitutional and ordered that he be extradited to the United States, which the Government of Mozambique appealed. (*Id.* ¶ 53.) The Government submits that it repeatedly sought updates and that OIA representatives met with South African officials throughout 2022 and 2023, but Mozambique's serial appeals further extended the litigation proceedings. (Gov't Opp. at 5 (citing Olson Chang Decl. ¶¶ 54-64).)

Finally, on May 24, 2023, South Africa's Constitutional Court—the country's highest court—ordered that Chang be extradited to the United States. (Olson Chang Decl. ¶ 65.) On July 12, 2023, Chang was extradited to the United States. (*Id.* ¶¶ 66-67.)

### 2. Allam's Motion

The factual background pertaining to Allam's motion is much shorter and more straightforward.

Pursuant to the sealed Initial Indictment, the Government contacted OIA in late 2018 "in connection with this case to inquire about the potential for extradition of a Lebanese citizen from Lebanon." (Jeffrey M. Olson Declaration in Support of Opposition to

Allam Mot. to Dismiss ("Olson Allam Decl.") (Dkt. 496-1) ¶ 9.)
OIA informed the Government that it would be futile to seek extradition because the United States does not have an extradition treaty with Lebanon. Instead, the Government obtained an INTERPOL Wanted Person Diffusion for Allam's arrest, excluding distribution to Lebanon. (*Id.*)

After the Initial Indictment was unsealed on March 6, 2019, (*see* Order Unsealing Indictment (Dkt. 49),) Allam became aware of the charges against him—and retained counsel—but he did not surrender himself to the United States to defend the charges. (Allam Mot. at 5.) Instead, since the unsealing, Allam has lived openly in Lebanon as a Lebanese citizen who has "never stepped foot in the United States." (*Id.* at 1, 15.) He is, however, unable to travel outside of Lebanon for fear of arrest pursuant to the INTERPOL Diffusion. (*Id.*)

On December 2, 2019, following a six-week trial, co-defendant Jean Boustani was acquitted on all counts by a jury verdict. (*See id.* at 4-5; Jury Verdict (Dkt. 370).) Still, Allam has not appeared before this court. Instead, his counsel filed the instant motion to dismiss the Indictment on speedy trial grounds. (*See generally* Allam Mot.)

## II. PROCEDURAL HISTORY

Chang and Allam both sought leave to file motions to dismiss on speedy trial grounds in June of 2023. (*See* Allam Request for Leave to File Mot. (Dkt. 460); Chang Request for Leave to File Mot. (Dkt. 462).) The court held a pre-motion conference on June 26, 2023 granting leave for Defendants to file their motions. (*See* Minute Entry dated 6/29/2023.)

Following Chang's extradition to the United States, he appeared before the court for arraignment on July 13, 2023 and pleaded

not guilty to all charges. (*See* Minute Entry dated 7/13/2023 (Dkt. 468).) The court found that Chang was a flight risk and remanded him to custody pending trial. (*See* Order of Detention (Dkt. 469).)

As for Allam, he is still in Lebanon and has therefore not appeared before this court. Nonetheless, his counsel has appeared on Allam's behalf, including for the pre-motion conference, and submitted the opening brief and Reply to the Government's opposition. (*See* Minute Entry dated 6/29/2023; Allam Mot.; Allam Reply.) On November 2, 2023, the Government sought leave to file a sur-reply to address "factual misstatements" made in Allam's reply brief, namely that Lebanon has extradited its own citizens to the United States despite the absence of an extradition treaty. (*See* Gov't Request to File Sur-Reply (Dkt. 508) at 1.) The court granted the Government leave to file a short sur-reply, (*see* Gov't Sur-Reply (Dkt. 510)) and permitted Allam to respond. (*See* Allam Response (Dkt. 513).)

The court held oral argument for both motions on November 15, 2023 and reserved decision. (*See* Minute Entry dated 11/16/2023.)

The court now turns to the pending motions to dismiss.

## III. LEGAL STANDARDS

### A. Sixth Amendment

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial." U.S. Const. amend. VI. The right to a speedy trial serves three primary interests of criminal defendants: "(i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired." *United States v. Black*, 918 F.3d 243,

254 (2d Cir. 2019).[3] Independent of the rights of the accused, the right to a speedy trial also serves "a societal interest in the fair and efficient operation of the criminal justice system and in limiting the costs to the community of pretrial detention and its deleterious effects." *Id.* The court and the government owe an "affirmative obligation" to criminal defendants and to the public to bring matters to trial promptly. *United States v. New Buffalo Amusement Corp.*, 600 F.2d 368, 377 (2d Cir. 1979). And as a corollary to this right, the government "owe[s] the additional duty of monitoring the case and pressing the court for a reasonably prompt trial." *United States v. Vispi*, 545 F.2d 328, 334 (2d Cir. 1976).

Speedy trial claims are analyzed under the four-factor balancing test set forth in *Barker v. Wingo*, 407 U.S. 514 (1972). Under *Barker*, courts must consider: the "[l]ength of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant." 407 U.S. at 530. The first factor, the length of delay, operates as a threshold inquiry: courts "will only consider the other *Barker* factors when the defendant makes a showing that that the interval between accusation and trial has crossed the threshold dividing ordinary from presumptively prejudicial delay." *United States v. Ghailani*, 733 F.3d 29, 43 (2d Cir. 2013)). Once the analysis is triggered, no one factor is "a necessary or sufficient condition to the finding of a deprivation of the right of speedy trial," and all "must be considered together with such other circumstances as may be relevant." *Barker*, 407 U.S. at 533.

---

[3] When quoting cases, unless otherwise noted, all citations and internal quotation marks are omitted, and all alterations are adopted.

## B.   Federal Rule of Criminal Procedure 48(b)

Federal Rule of Criminal Procedure 48(b)(3) provides that "[t]he court may dismiss an indictment, information, or complaint if unnecessary delay occurs in . . . bringing a defendant to trial." Although related to the Sixth Amendment right to a speedy trial, Rule 48(b) extends beyond constitutional violations and embraces the inherent power of a court to dismiss an indictment for unnecessary delay. *United States v. Salzmann*, 417 F. Supp. 1139, 1171-73 (E.D.N.Y.), *aff'd*, 548 F.2d 395 (2d Cir. 1976). Even without finding a constitutional violation, the court has broad discretion to determine whether to dismiss an indictment under Rule 48(b). *United States v. Lane*, 561 F.2d 1075, 1078 (2d Cir. 1977). That said, dismissal is required when there has been a violation of a defendant's right to a speedy trial. *Salzmann*, 417 F. Supp. at 1171-73; *see also Pollard v. United States*, 352 U.S. 354, 361 n.7 (1957).

In the Second Circuit, courts utilize the same four *Barker* factors when analyzing a defendant's speedy trial right under Rule 48(b). *See United States v. Blaustein*, 325 F. Supp. 233, 236 (S.D.N.Y. 1971).

The court will address Chang's motion to dismiss under the Sixth Amendment first, followed by Allam's. The court will end with its analysis of both motions under Rule 48(b).

## IV.  CHANG'S MOTION TO DISMISS

### A.   Length of the Delay

The first factor of the analysis, the length of delay, entails a "double enquiry." *Doggett v. United States*, 505 U.S. 647, 651 (1992). An accused must first allege that the delay is beyond ordinary, and once shown, a court then considers "the extent to which the delay stretches beyond the bare minimum needed to trigger judicial examination of the claim." *Id.* at 652; *United States v. Cavan*, No. 09-CR-1120 (PKC), 2016 WL 4098582, at *3

(S.D.N.Y. July 28, 2016). The Second Circuit calculates the "relevant interval" for Sixth Amendment speedy trial claims beginning from the indictment or arrest. *Black*, 918 F.3d at 259. Weighing whether a delay is beyond ordinary is "necessarily dependent upon the peculiar circumstances of the case." *Barker*, 407 U.S. at 530-31.

The presumption that pretrial delay has prejudiced the accused intensifies over time. Post-accusation delays of one year are "presumptively prejudicial" and trigger the speedy trial inquiry. *See Doggett*, 505 U.S. at 652 n.1; *see also, e.g., New Buffalo Amusement Corp.*, 600 F.2d at 377 (holding that a delay of four and a half years largely due to institutional delays was "unquestionably substantial"); *United States v. Tigano*, 880 F.3d 602, 612 (2d Cir. 2018) (holding that a delay of nearly seven years after numerous administrative lags was "extreme").

This presumptive prejudice can be rebutted, however, by analysis of the other *Barker* factors. *See, e.g., United States v. Cabral*, 979 F.3d 150, 163-65 (2d Cir. 2020) (finding no violation of defendant's right to a speedy trial after a delay of eleven years due to the defendant's responsibility for the delay and lack of prejudice suffered); *United States v. Ramos*, 429 F. Supp. 2d 241, 252 (S.D.N.Y. 2006) (finding no violation of defendant's right to a speedy trial after a delay of over five years where the defendant caused the delay and did not timely assert his right). Even if a defendant can establish a delay long enough to satisfy this threshold, that will not be dispositive. *Garcia Montalvo v. United States*, 862 F.2d 425, 426 (2d Cir. 1988) ("delay [between indictment and trial] alone is insufficient to constitute a Sixth Amendment violation.").

Chang asserts, and the Government does not dispute, that a delay of four and a half years between issuance of the Indictment and Chang's extradition to the United States to face prosecution is "unquestionably substantial" and triggers a *Barker* inquiry.

(Chang Mot. at 12; Gov't Opp. at 7); *New Buffalo Amusement Corp.*, 600 F.2d at 377.

Accordingly, the first *Barker* factor weighs in favor of Chang.

### B.   Reason for the Delay

The second *Barker* factor—the reason for delay—is both critical and fact-intensive. Indeed, it is the "flag all litigants seek to capture." *United States v. Loud Hawk*, 474 U.S. 302, 315 (1986). The central inquiry of this factor is "whether the government or the criminal defendant is more to blame for the delay." *United States v. Ramos*, 420 F. Supp. 2d 241, 246 (S.D.N.Y. 2006) "Delay attributable to the defendant or to a legitimate governmental purpose will rarely implicate the Sixth Amendment, whereas intentional governmental conduct aimed at gaining a trial advantage weighs in favor of finding a violation." *Cavan*, 2016 WL 4098582, at *3.

Because of the government's affirmative constitutional duty to provide a speedy trial, the prosecution has an obligation to justify any pre-trial delay. *United States v. Fernandes*, 618 F. Supp. 2d 62, 68 (D.D.C. 2009). The government bears the burden of both "bringing the accused swiftly to trial" and "exercis[ing] due diligence in attempting to locate and apprehend the accused." *United States v. Moreno*, 789 F.3d 72, 79 (2d Cir. 2015). At the same time, the government is not required to pursue every possible action. *See id.* at 80.

Deliberate delays designed "to hamper the defense" are "weighted heavily against the government." *Barker*, 407 U.S. at 531. Delays caused by "negligence or overcrowded courts," however, are weighted "less heavily." *Id.* And some delays, such as those attributable to either the defendant or the extraditing country's laws and procedures, do not count against the government. *See, e.g., United States v. Manning*, 56 F.3d 1188, 1195 (9th Cir. 1995) ("If the delay can be attributed to [the defendant] himself,

he will be deemed to have waived his speedy trial rights entirely."); *United States v. Reumayr*, 530 F. Supp. 2d 1200, 1205-06 (D.N.M. 2007).

"When the United States has a valid extradition treaty in place with a foreign country and prosecutors formally seek extradition pursuant to that treaty, courts routinely hold that the government has satisfied its diligence obligation." *Fernandes*, 618 F. Supp. 2d at 69. However, a "formal request for extradition need not be made before due diligence can be found to exist." *See Ramos*, 420 F. Supp. 2d at 246. Again, whether there has been due diligence is a fact-specific inquiry. *Id.*

Here, Chang asks this court to find that the significant delay in his extradition is "entirely the responsibility" of the Government because, according to Chang, it knew that (1) choosing to arrest Chang in South Africa would cause significant delay and (2) refusing to intervene in the South African proceedings would further delay the extradition process. (*See* Chang Mot. at 2; Chang Reply (Dkt. 502) at 1-2.) Specifically, Chang alleges that the Government "did nothing" to "actually" secure Chang's extradition beyond its initial formal extradition request to South Africa on January 28, 2019. (Chang Mot. at 5-6.) Chang asserts that the years of inaction is "particularly striking" since it was the U.S. Government that chose South Africa as the "forum for Mr. Chang's arrest and extradition" despite knowledge that the South Africa legal system is "overwhelmed." (*Id.* at 3.)

### 1. South Africa as the Forum for Extradition Proceedings

The Government concedes that it was aware that the extradition process was "lengthy" and could "take years." (Olson Chang Decl. ¶ 18.) However, its filing an extradition request in South Africa was a strategic decision ensure Chang's arrest in a country with which the United States had an extradition treaty. (*Id.*) Had the

Government chosen to wait until Chang returned to Mozambique—a country with which the United States does not have an extradition treaty—it ran the risk of an otherwise futile attempt at securing Chang's extradition. *See Cabral*, 979 F.3d at 159 (holding that the United States "was not required to pursue a futile extradition request" in a country that does not extradite its citizens). Thus, the record demonstrates that choosing South Africa as the forum for Chang's extradition was not an "attempt[] to undermine [Chang's] speedy trial right by circuitous and indirect methods," but rather an attempt to expedite his extradition to the United States. *United States v. Alexander*, 817 F.3d 1178, 1182 (9th Cir. 2016).

Chang argues that after the Government chose to initiate extradition proceedings in South Africa, it abandoned its extradition efforts after his co-defendant, Jean Boustani, was acquitted on all counts by a jury verdict in December 2019. (Chang Mot. at 8.) In support of his contention, Christiaan Frederick Krause, Chang's South African counsel, submits to the court that the "[United States'] Prosecution has not been active in the South African Litigation since June 2019." (Krause Decl. ¶ 18.) Further, "[h]ad the Prosecution intervened . . . to express its interest in Mr. Chang's extradition to the United States," Krause states such interest would have "assisted in persuading the South African courts and the Minister of Justice to act more quickly in extraditing Mr. Chang to the United States." (*Id.* ¶ 19.) Moreover, Chang argues that the Government made an intentional decision *not* to intervene in the litigation proceedings by way of its September 3, 2019 diplomatic note, which shows that the Government not only gave up on prosecuting Chang, but deliberately delayed his extradition, warranting a finding against the Government on this factor. (Chang Mot. at 2; Chang Reply at 2-3.)

The court finds that the delay caused by the litigation proceedings in South Africa cannot be attributed to the Government nor

was the Government's decision not to intervene designed to hamper the defense. As the court noted, following the first decision in May 2019 by then-Minister of Justice Masutha that Chang should be extradited to Mozambique, the United States presented a diplomatic note to South Africa requesting a stay of his extradition while it sought reconsideration of the Minister's decision. (Olson Chang Decl. ¶¶ 34-36.) Diplomatic officials then met with the new Minister of Justice, Ronald Lamola, on June 7, 2019 to convince him to reconsider his predecessor's decision. (*Id.* ¶ 37.)[4] Then on September 3, 2019—three months prior to Mr. Boustani's acquittal—the United States submitted another diplomatic note to South Africa affirming its continued interest in Chang's extradition to the United States and explaining that it would not intervene in the pending litigation but that it nevertheless "stood ready" to meet with the Minister once the matter was remitted to him for reconsideration and decision. (*Id.* ¶ 40.)

Contrary to Chang's assertions, the United States was not required to intervene in the litigation filed by civil society organizations when those entities advanced arguments pertaining to laws of Mozambique and South Africa. Chang makes a conclusory statement, based on the representation by his South African counsel, that had United States intervened, the South African courts would have "acted more swiftly" to extradite Chang to the United States. (Chang Mot. at 8; Krause Decl. ¶ 19.) But the United States did hire local counsel to track this litigation and it is unclear what, if any, arguments the United States would have advanced that it had not already made. And notably, Chang states that the United States is to blame for this delay by not intervening, but it is not until years after the filing of the civil

---

[4] Between July and August 2019, two civil society organizations intervened in the litigation, both challenging the decision to extradite Chang to Mozambique. (*Id.* ¶ 39.) The Government, through its local counsel, closely tracked the developments in the South African proceedings and periodically received updates in the matter. (*Id.* ¶ 41.)

society litigation, on August 24, 2022, that Chang consented to extradition to either Mozambique *or* the United States. (Krause Decl. ¶ 14; Exh. I to Krause Decl. (Dkt. 483-9 ¶ 4.)[5] Despite Chang's consent, it took almost a year for the Constitutional Court of South Africa to determine that Mr. Chang should be extradited to the United States. (Olson Chang Decl. ¶ 66.)

In his Reply, Chang points to *Rayborn v. Scully*, 858 F.2d 84 (2d Cir. 1988) to argue that the United States should have intervened in South Africa's proceedings. (Chang Reply at 6-7.) In that case, the defendant was not a foreign national, but a suspect in a New York murder case who faced unrelated charges in Pennsylvania where both states worked together to apprehend the defendant and bring him to trial. *Rayborn*, 858 F.2d at 86-87. The court determined that "a state is perfectly entitled to rely in good faith upon the efforts of another jurisdiction when a suspect for whom an arrest warrant has been issued evades arrest in the first state and absconds to that other jurisdiction." *Id.* at 91. The Government cited this statement from *Rayborn* in its briefing, (Gov't Opp. at 13), but Chang faults the Government for failing to include the following sentence where the Circuit qualified that such reliance is appropriate "if reasonable and grounded in the belief that the helping jurisdiction is in fact conducting a proper investigation." *Id.* (*See also* Chang Reply at 6-7.) Chang then argues that "nothing" about the South African process constituted a proper investigation and as a result the delay is attributable to the U.S. Government. (Chang Reply at 7.)

---

[5] This consent is not to be confused with Chang's September 10, 2021 Notice of Intention to Abide filed in the South African proceedings. (*See* Krause Decl. ¶ 12; Ex. G to Krause Decl., Notice of Intention to Abide ("Not. of Intent to Abide") (Dkt. 483-7).) That notice only provided that Chang was willing to abide by the Minister's decision, whether that be extradition to Mozambique or to the United States.

But this argument is unavailing. The Government made a reasonable and strategic choice to pursue arrest and extradition in South Africa as opposed to Mozambique where its efforts would have been futile. His extradition was then complicated because Mozambique submitted its own competing extradition request, and at every juncture, opposed Chang's prosecution in the United States. Chang points to nothing in the record to suggest that the United States's intervention would have helped "speed up" South Africa's extradition process. And there is no indication that the delay was due to the United States lacking a basis for a reasonable belief that there would be a "proper investigation" in the extradition proceedings. *See Rayborn*, 858 F.2d at 86-87.

A similar case from the district court of New Mexico, *United States v. Reumayr,* is instructive here. 530 F. Supp. 2d 1200. In that case, the defendant, a Canadian citizen facing charges in Canada and New Mexico, argued that the delay in extraditing him to the United States was entirely attributable to the government because the government requested extradition rather than allowing him to be tried in Canada. According to the defendant in *Reumayr*, the request itself caused extreme delays due to the resulting litigation in Canadian courts, which included a multitude of appeals. *Id.* at 1203-04. As in this case, the defendant argued that it was "the Government's choice to reach into" the foreign country to pursue the extradition proceeding and that he was in this foreign country "not as a fugitive from the United States." *Id.* at 1205.

The court rejected this argument, determining that "the Government had no control over the Canadian proceedings, had no way of speeding up the process, and was forced to wait for over six years while Defendant pursued all avenues of appeal in an attempt to avoid extradition" to the United States. *Id.* The court in *Reumayr* explained that there is no right to "speedy extradition" and that "foreign countries extraditing defendants to this country

are entitled to follow the extradition procedures established by their laws, and the United States is not responsible in a Sixth Amendment sense when those laws and procedures create delays, however long." *Id.* at 1205-06.

These principles are particularly applicable in light of Mr. Chang's own efforts to avoid trial in the United States. In the November 2019 decision invalidating former Minister Masutha's decision, the court explained that throughout the extradition proceedings, Chang "resisted his extradition to the USA [while] actively seeking his extradition to Mozambique," going as far as to resign from his position as Member of the National Government in order to relinquish immunity that was at issue in determining whether he could be prosecuted in Mozambique. *Chang v. Minister of Justice and Correctional Services* 2019 (1) All SA 747 (GJ) at 11 para. 34 (S. Afr.) (*Chang I*).[6]

In attributing blame, the court therefore finds that the time between Chang's arrest and the Government's express declination to intervene in the South African proceedings cannot be attributed to the Government. The court instead finds that this time, where he opposed extradition during the proceedings is attributable to Chang. *See Reumayr*, 530 F. Supp. 2d at 1207 (finding that where the defendant resists trial through "vigorous litigation of extradition proceedings" the delay "caused by that resistance is properly attributed to the defendant").

---

[6] The court notes that while excerpts of this decision were provided to the court in Chang's motion papers, this section was conveniently not included. (*Cf.* Ex. D to Krause's Decl., *Chang I* Excerpts (Dkt. 483-4)). This court considers the High Court's full Opinion as it is a public decision relevant to the case at bar. *See, e.g., In re Air Cargo Shipping Servs. Antitrust Litig.*, No. 06-MD-1775 (JG) (VVP), 2008 WL 5958061, at *33 (E.D.N.Y. Sept. 26, 2008), *report and recommendation adopted in part*, No. 06-MD-1775 (JG) (VVP), 2009 WL 3443405 (E.D.N.Y. Aug. 21, 2009), *aff'd*, 697 F.3d 154 (2d Cir. 2012).

2.   The Government's Efforts to Secure Chang's
Extradition

Delay due to extradition does not weigh against the Government where the Government moves with reasonable alacrity in seeking extradition. *See United States v. Moore,* 653 F.2d 384, 388 (9th Cir. 1981) (rejecting defendant's speedy trial claim because the government promptly sought the defendant's extradition and did not obtain trial advantages from delay). Construing the events in Olson's declaration as true,[7] Defendant's assertion that the Government did absolutely nothing to extradite and prosecute him is "simply not true." *See United States v. Shevelev,* No. 08-CR-60159, 2014 WL 495393, at *3 (S.D. Fla. Feb. 6, 2014). The Government promptly initiated extradition proceedings following the issuance of the sealed Initial Indictment and remained involved and persistent throughout the extradition process. (*See generally* Olson Chang Decl.) Indeed, the Government argues that OIA representatives requested updates from South Africa on at least six occasions following Minister Lamola's decision to extradite Chang to Mozambique in December 2021, including at an in-person meeting. (Gov't Opp. at 16; Olson Chang Decl. ¶¶ 54-55, 57-58, 60, 63.) "The fact that it took [over four years] for Defendant to be extradited is not within the government's control." *Shevelev,* 2014 WL 495393, at *3; *see also* 9A Federal Procedure, Lawyer's Edition § 22:1312 ("Ordinarily, the delays involved in international extradition do not violate the speedy-trial right. Absent evidence of any formal waiver of extradition, courts are unwilling

---

[7] "In deciding a pretrial motion to dismiss, the Court must accept the Government's factual allegations as true," and the "indictment must be read to include facts which are necessarily implied by the specific allegations made." *United States v. Gasperini,* No. 16-CR-441 (NGG), 2017 WL 2399693, at *2 (E.D.N.Y. June 1, 2017).

to attribute to the government any delay caused by formal extradition proceedings initiated in compliance with an extradition treaty.").

Putting aside the time period that Chang contested his extradition to the United States, he does submit that as early as September 10, 2021, he was willing to face trial in the United States when he filed a Notice of Intention to Abide by whichever decision the South African courts made with respect to his extradition. (Chang Mot. at 6; Krause Decl. ¶ 12; Not. of Intent to Abide.) However, this Notice was filed in the South African proceedings that the United States was not a part of. Even if this court were to find that the Government should be partially responsible for failing to intervene, the court would find that the time period attributable to the Government is 670 days, or close to two years, calculated from the date of Chang's Notice of Intention to Abide (September 10, 2021) through his extradition date (July 12, 2023).[8] In contrast, Chang's actions are responsible for the delay beginning from the date of his arrest (December 29, 2018) to the filing of the Notice of Intention to Abide. That time period is 986 days, or close to three years.

If there was any doubt as to the Government's diligence, the court finds that only the portion between Chang's filing of the Notice and his extradition could be construed as attributable to the Government. That time period, however, is still less than the delay attributable to Chang. *See Ramos*, 420 F. Supp. 2d 246 (noting that the central inquiry for the second Barker factor as "whether the government or the criminal defendant is more to blame for the delay.")

---

[8] In calculating the delay attributable to the Government, the court need not start from the date of the Government's declination in September 2019 because throughout that period, Chang was contesting his extradition to the United States. *See Chang I,* 2019 (1) All SA 747 (GJ) at 11 para. 34.

Accordingly, the second *Barker* factor weighs in favor of the Government.

## C.  Assertion of the Speedy Trial Right

On the third *Barker* factor, this court must consider when the Defendant invoked his right to a speedy trial. *Barker*, 407 U.S. at 531-32. "In practice, an accused's demand for a speedy trial tends not to heavily influence the analysis except at the extremes." *United States v. Ghailani*, 751 F. Supp. 2d 515, 529 (S.D.N.Y. 2010), *aff'd*, 733 F.3d 29 (2d Cir. 2013). Courts have also tended to "discount a defendant's belated demand for a speedy trial if convinced that it was opportunistic, raising his speedy trial right when it suited his interests but not when [the] delay benefitted him." *Id.* In contrast, "early and frequent demands by a defendant for a speedy trial have proved significant if they have been ignored by the prosecution." *Id.* A longer gap between indictment or accusation and invocation of the right to speedy trial thus works against a defendant.

Chang contends that he has been asserting his right to a speedy trial in the United States for years. (Chang Mot. at 18-19.) Specifically, he argues he first invoked his right to a speedy trial on September 10, 2021, when he filed his Notice of Intention to Abide in the South African litigation consenting to follow whatever decision the South African courts make regarding his extradition. (*Id.*) Chang further argues that he continued to invoke his right two more times, on August 24, 2022 through a letter to the South African courts consenting to being surrendered to either the United States or Mozambique, and on June 8, 2023, when his counsel in this matter entered a Notice of Appearance and filed a letter requesting a pre-motion conference to seek leave to file the instant motion to dismiss. (*Id.*)

The Government responds that Chang's 2021 Notice of Intention to Abide filed in South Africa could not constitute an assertion of his rights under the United States Constitution. (Gov't Opp. at

18.) And, even so, this filing came two-and-a half years into the extradition process and after he initially sought extradition to Mozambique, which should weigh against Chang. (*Id.*)

The Initial Indictment was sealed prior to Chang's arrest. Accordingly, Chang could not assert his right to a speedy trial until his arrest on December 29, 2018. *See Ramos*, 420 F. Supp. 2d at 250 ("Courts in this district have noted that where the defendant is unaware of the indictment, he cannot be taxed for invoking his speedy trial right only after his arrest.").

If construing his request to file a motion to dismiss as his first assertion of his right to a speedy trial, the factor weighs heavily against Chang. This request was made on June 8, 2023, one month before his extradition and almost five years after his arrest, and almost four years after the unsealing of the Initial Indictment. (*See* Request for PMC (Dkt. 462); Order Unsealing Indictment.) The length of this time gap weighs against Chang.

Even if construing his Notice of Intention to Abide in 2021 as his first invocation of his right to a speedy trial in the United States, nearly three years had passed between the arrest and this Notice. Courts in this Circuit have found against defendants who wait to assert their rights following arrest. *See, e.g., United States v. Shine*, No. 17-CV-28 (FPG), 2018 WL 3737877, at *3 (W.D.N.Y. Aug. 7, 2018) (finding third *Barker* factor weighed heavily against defendant who did not assert his right to speedy trial until 17 months after he was initially detained); *United States v. Morgan*, 493 F. Supp. 3d 171, 220 (W.D.N.Y. 2020) (finding third *Barker* factor weighed against defendants who invoked speedy trial rights a year after the bulk of delay caused by discovery issues had elapsed).

Moreover, as discussed *supra*, Chang contested his extradition for years. The court's analysis in *United States v. Cavan* is apt here:

> Rather than consenting to his extra-
> dition, [the defendant] contested
> his extradition for more than two
> years. Where, as here, it is mani-
> festly apparent that a defendant has
> no serious interest in the speedy
> prosecution of the charges against
> him, a court need not ignore the de-
> fendant's fugitivity or recalcitrance
> in determining whether his sixth
> amendment rights have been vio-
> lated.

*Cavan*, 2016 WL 4098582, at *5; *see also United States v. Nassimi*,
No. 04-CR-706 (LTS), 2023 WL 3584409, at *5 (S.D.N.Y. May
22, 2023) (finding third *Barker* factor weighed against defendant
who waited years to file motion after learning of indictment);
*United States v. Gayatrinath*, No. 02-CR-673 (RMB), 2011 WL
873154, at *4 (S.D.N.Y. Mar. 11, 2011) (holding third *Barker*
factor weighed against defendant who was pending extradition
where he waited years after learning of indictment to file speedy-
trial motion); *United States v. Saric*, No. 95-CR-661 (RPP), 2011
WL 31079, at *9 (S.D.N.Y. Jan. 4, 2011) (finding third *Barker*
factor weighed against defendant where he knew of charges for
years before filing motion); *see also United States v. Manning*, 56
F.3d 1188, 1195 (9th Cir. 1995) (holding that a defendant's "af-
firmative resistance of the government's efforts to secure his
presence in the United States constitutes an intentional relin-
quishment of his right to a constitutional speedy trial, and he
cannot now complain of the delay that he himself caused");
*United States v. Mitchell*, 957 F.2d 465, 469 (7th Cir. 1992) (con-
cluding that third *Barker* factor weighed against a defendant
where the defendant "made no attempt to demand a trial, to
waive extradition, or to otherwise seek to return to the United
States for trial"). In sum, the court finds that because Chang ac-
tively resisted and contested his extradition for years between the

Indictment and his present motion, he appeared to have "no serious interest in the speedy prosecution of the charges against him." *Cavan*, 2016 WL 4098582, at *5.

Accordingly, the third *Barker* factor weighs in favor of the Government.

### D.  Prejudice

The fourth and final *Barker* factor is prejudice from the delay. "[E]xcessive delay presumptively compromises the reliability of a trial in ways that neither party can prove or, for that matter, identify." *Doggett*, 505 U.S. at 655. However, "such presumptive prejudice cannot alone carry a Sixth Amendment claim without regard to the other *Barker* criteria," but rather "it is part of the mix of relevant facts, and its importance increases with the length of delay." *Cabral*, 979 F.3d at 163 (quoting *Doggett*, 505 U.S. at 656). Where the court finds that the delay cannot entirely be attributed to the Government, "the presumption of prejudice is correspondingly weakened." *Ramos*, 420 F. Supp. 2d at 252.

Here, as discussed, the Government acted with reasonable diligence in extraditing Chang. Thus, the presumption is weakened and the court considers whether there is "specific" or "particularized prejudice" to Chang from the delay. *Id.*

Particularized prejudice from a delay encompasses oppressive pretrial incarceration, anxiety and concern of the accused, and an impairment of the defense. *Black*, 918 F.3d at 264.[9] Impairment of defense is the "most serious" of these forms of prejudice. *Barker*, 407 U.S. at 532.

---

[9] The Government concedes that Chang has suffered two of the three forms of prejudice against which the speedy trial protects: "four years of pretrial incarceration and accompanying anxiety." (Gov't Opp. at 20.) The Government argues, instead, that the time Chang spent in solitary confinement in

Finally, a lengthy period of incarceration is relevant to the Sixth Amendment prejudice analysis, but it is not dispositive. *See Barker*, 407 U.S. at 533 ("We regard none of the four factors identified above as either a necessary or sufficient condition to the finding of a deprivation of the right of speedy trial."). What is of greater importance is "the extent to which that incarceration has impaired the ability to mount a defense against the charges in the indictment." *United States v. Paul*, 326 F. Supp. 2d 382, 388 (E.D.N.Y. 2004).

The court does not take lightly the years Chang spent incarcerated in a South African prison—most of which was under solitary confinement; the lack of medical and physical support he received while detained in South Africa; and the personal, professional, and familial setbacks he has endured since his arrest. However, since, for the reasons discussed, most of the delay is attributable to Chang, the "prejudice he has suffered cannot be weighed against the Government." *Reumayr*, 530 F. Supp. 2d at 1208; *see also United States v. Cancino*, 565 F. Supp. 3d 1029, 1037 (N.D. Ill. 2021) (finding that the "ample evidence" substantiating defendant's oppressive pretrial incarceration "does not tip the scales in his favor" in light of his "own responsibility for the delay" and his failure to timely assert his speedy trial rights).

Chang also argues that he has lost recollection of key events relating to the signing of the three loans at issue. (Chang Mot. at 20). Fading memories, however, are insufficient for a particularized showing of prejudice. *See Moreno*, 789 F.3d at 81.[10] Instead, Chang offers evidence of actual prejudice by asserting that he is

---

South Africa should not weigh against the Government where it acted diligently in obtaining Chang's extradition. (*Id.*) The court will focus its analysis on this argument as well as whether Chang's defense has been impaired.

[10] Moreover, fading memories often "work to the accused's advantage." *Barker*, 407 U.S. at 521.

no longer in possession of documents he regularly had access to as Minister of Finance because he lost access to the electronic devices he used while in government service. (Chang Mot. at 19-20.) While it is true that the Government has seized one device from Chang and has provided a forensic copy of its contents to the defense, Chang asserts that there is a "cache of Mozambique government documents" that the U.S. Government never collected and that may now not be available. (Chang Reply at 8-9.) The court finds that this is sufficient to show that Chang has suffered at least some prejudice resulting from the delay.

### E.  Balancing of the *Barker* Factors

Though four and a half years passed between Chang's arrest and extradition, the Government pursued the Defendant with good faith and diligence, and Chang contested his extradition during the majority of the delay in the South African proceedings. The reason for the delay therefore weighs against him. Chang's delayed assertion of his right to a speedy trial also weighs against him. And any prejudice suffered as a result of the delay is at least partially attributable to Chang as a result of his resistance.

In light of these factors, Chang's showing of actual prejudice is insufficient to overcome the other *Barker* factors weighing against him. Thus, Chang's motion to dismiss the Indictment on speedy trial grounds under the Sixth Amendment is DENIED.

## V.  ALLAM'S MOTION TO DISMISS

### A.  Length of the Delay

The court now turns to Allam's motion. Similar to Chang, the Government concedes that a delay of more than four years since the issuance of the Indictment naming Allam is substantial and triggers a *Barker* inquiry. (Allam Mot. at 12; Gov't Opp. at 7) This factor weighs in favor of Allam and, as with Chang, the court must now consider the remaining *Barker* factors to determine whether there has been a constitutional violation.

### B.   Reason for the Delay

The Government is not required to pursue efforts that would be futile. *United States v. Blanco*, 861 F.2d 773, 778 (2d Cir. 1988). Thus, if extradition efforts would be futile, due diligence may not require that the Government pursue such a course. *See, e.g., Ramos*, 420 F. Supp. 2d at 246 ("[C]ourts in the Second Circuit have been clear that a formal request for extradition need not be made before due diligence can be found to exist."); *United States v. Demirtas*, 204 F. Supp. 3d 158 (D.D.C. 2016) (ruling that the government proceeded with due diligence, despite not requesting extradition, because "the government has established that it had a good-faith belief, supported by substantial evidence, that a formal request to extradite [the Defendant] would have been futile"); *United States v. Bagga*, 782 F.2d 1541 (11th Cir. 1986) (holding that due diligence "do[es] not require the government to pursue futile legal gestures").

Allam argues that he bears no responsibility for the delay because he has taken no affirmative steps to frustrate the Government's ability to pursue its prosecution. (Mot. at 1.) Specifically, Allam argues that the entire length of the delay is attributable to the Government where (1) it failed to act with the requisite due diligence to bring Allam's case to trial, and (2) did not initiate extradition proceedings. (Allam Mot. 10-13.)

In his Reply and during oral argument, Allam also took issue with OIA Associate Director, Jeffrey M. Olson's declaration surrounding the facts of Allam's case. (Allam Reply at 2; Oral Argument Tr. at 4:10-5:6, 14:24-15:6.) Allam asserts that Olson has "no first-hand knowledge of or involvement in the government's prosecution of Allam" because he does not assert that he is "familiar with the dates and events relevant" to Allam's case. (Allam Reply at 3.) To support this, Allam provides a red line comparison of Olson's declaration in this case and a previous declaration filed in *United States v. Khoury*, No. 4:08-CR-00763, (Dkt. 44-1)

(S.D. Tex. Sept. 16, 2019), to suggest that the Government largely copy-and-pasted assertions from a different case. (*See* Dkt. 505-2; *Compare* Olson Allam Decl. ¶ 5 *with* Ex. 1 to Allam Reply, Olson Declaration in *Khoury* ("Olson *Khoury* Decl.") (Dkt. 505-1) ¶ 5.) Allam also distinguishes the efforts of the U.S. Government in *Khoury* and in this matter to further suggest that the Government is to blame for the delay. (*See* Allam Reply at 3 n.1.) According to Allam, the Government "took numerous, persistent steps over several years to secure Khoury's return," whereas here, the Government has failed to do anything. (*Id.* (citing *Khoury*, 2019 WL 6687715, at *1).)

*Khoury* is instructive in considering Allam's motion. In that case, defendant Samir Rafic Khoury, was a naturalized citizen of the United States and a native of Lebanon. *Khoury*, 2019 WL 6687715, at *1. A year after the grand jury returned a sealed indictment charging Khoury with conspiracy to commit mail and wire fraud, the U.S. Government entered an arrest warrant into the National Crime Information Center ("NCIC") database to alert border officials if Khoury attempted to re-enter the United States. *Id.* Later that year, the Government issued an INTERPOL Wanted Person Diffusion to 12 countries (excluding Lebanon). *Id.* Six years later, the Government issued another Diffusion to the 12 countries; four years after that, the Government issued an INTERPOL Red Notice. *Id.*

In his motion to dismiss, Khoury noted, as does Allam, that Lebanese law does not explicitly prohibit the extradition of Lebanese citizens. *Id.* at *3. Khoury then argued that the Government failed to act with reasonable diligence because the only actions it took in the first six years after the issuance of the sealed indictment

were entering Khoury's arrest warrant into the NCIC database and issuing an INTERPOL Diffusion. *Id.*[11]

The court in *Khoury* determined that an extradition request would be futile, noting that neither party could point to an instance where Lebanon extradited a citizen, let alone a Lebanese national. *Id.* at *3. The court then held that the Government was not required to file an extradition request and that the Government's actions—including conversations with Lebanese officials regarding the availability of extradition, entering Khoury's arrest warrant into the NCIC database given his status as a U.S. citizen, and issuing the INTERPOL Diffusion—constituted reasonable diligence. *Id.*

Unlike the defendant in *Khoury,* Allam draws the court's attention to instances where Lebanon purportedly extradited its citizens to the United States. (Allam Reply at 5-7.) The court finds it necessary to take a closer look at these extradition cases to determine whether there is a history of extradition by Lebanon.

### 1.   Lebanon's History of Extradition

In support of his argument that Lebanon does in fact extradite its citizens, Allam offers the declaration of Philippe Maalouf, a Lebanese citizen and attorney practicing law in Beirut, Lebanon. (*See* Ex. 5 to Allam Reply, Phillippe Maalouf Declaration ("Maalouf Decl.") (Dkt. 505-5) ¶ 1.) Maalouf submits that Lebanon granted extradition requests by the United States, including in 2002, 2017, and 2019. (*Id.* ¶¶ 18-20.)

The Government argues that the assertions made by Maalouf are factually incorrect and in fact, none of the examples cited involved extradition of Lebanese citizens. (Gov't Sur-Reply at 1.)

---

[11] The court's analysis focused only on the first six years because it was apparent Khoury became aware of the indictment when he moved to Lebanon in 2004, around the time the DOJ began its investigation. *Id.* at *4.

After consultation with OIA,[12] the Government submits that the three examples Allam cites are from these cases: *United States v. Harfoush*, No. 00-CR-9 (E.D. Va.)[13]; *United States v. Staton*, No. 11-CR-135 (E.D. Ky.); and *United States v. Salamey*, No. 19-CR-298 (M.D. Fla.)). (Gov't Sur-Reply at 2.)

The Government asserts that in *Harfoush*, defendant Mohammad Hassan Hammoude was deported, rather than extradited, from Lebanon in 2002. (Gov't Sur-Reply at 2.) Further, the Government asserts that he was a United States citizen born in Kuwait and not a citizen of Lebanon.[14] (*Id.*)

In *Stanton*, Clinton W. Staton was a United States citizen who served in the Navy. *See* Staton Sentencing Mem. filed in *Staton*, No. 11-CR-135 (E.D. Ky.) (Dkt. 33) at 4. He allegedly fled to Lebanon after learning of the indictment charging him with child pornography offenses. *See* Gov't Sentencing Mem. filed in *Staton*, No. 11-CR-135 (E.D. Ky.) (Dkt. 38) at 1. In that case, the United States was successfully able to extradite Stanton because he was a citizen of the United States and therefore a fugitive in Lebanon. Thus, again, not a Lebanese citizen.

---

[12] The OIA oversees extradition requests by foreign countries and on behalf of the United States. The OIA assists prosecuting authorities in the United States with preparing requests for extradition to be submitted to a foreign country and advises on extradition processes, both formal and informal. *See* Frequently Asked Questions Regarding Extradition, Office of International Affairs, U.S. Dep't of Just., https://www.justice.gov/criminal/criminal-oia/frequently-asked-questions-regarding-extradition (last updated August 11, 2023).

[13] The court takes note that the Government's citation of this case names only the defendant at issue, Hammoude. As there are multiple defendants in the case, this court refers to the full case citation as indicated on the matter's docket, No. 00-CR-9 (E.D. Va.).

[14] The court is unable to verify the facts of this case. Allam also does not refute these statements in his response to the Government's *sur reply*. (*See* Allam Response at 3.)

Finally, in the only case that appears to involve a Lebanese citizen, *Salamey*, Allam's argument still falls flat. In that case, it appears that Ali Hussein Salamey was both a U.S. citizen and a Lebanese citizen. *See* Christopher Aff. in Support of Complaint filed in *Salamey*, No. 19-CR-298 (M.D. Fla.) (Dkt. 1) ¶ 6. After custody battles with the mother of his child, Salamey fled to Lebanon with his son in violation of a court order, but voluntarily returned to the United States in order to protect his son. *Id.* ¶ 13; (Gov't Sur-Reply at 3.). Thus, while *Salamey* involved a citizen, it did not in fact involve a successful extradition.

In Allam's Response and in oral argument, he appears to retreat from his position that Lebanon has extradited its citizens on multiple occasions. Instead, counsel for Allam suggests that the efforts of the Government in each of those cases highlights how deficient the Government was in its efforts to extradite Allam. (Allam Response at 3-4; Oral Argument Tr. at 16:22-17:19.)

It suffices to say that the evidence submitted before the court does not show that Lebanon has a history of extraditing its citizens to the United States. It may be that there is "no explicit and direct provision in Lebanese law prohibiting the extradition of [a] Lebanese citizen" thereby permitting extradition subject to the discretion of the Lebanese government. (*See* Ex. 7 to Allam Reply, Judge Hatem Madi Declaration in *Khoury* (Dkt. 505-7) at 6.) But Allam has failed to show that Lebanon has ever exercised that discretion to extradite its citizens to the United States. This court "need not settle the parties' dispute over how to interpret [Lebanese law]." *Khoury*, 2019 WL 6687715, at *3. Where, as here, the relevant extradition treaty "left the extradition question to the discretion of appropriate foreign officials," and OIA's informal communications with those officials "revealed that they had no interest in extraditing" Lebanese citizens, "a formal request for extradition was not required to establish due diligence."

*Demirtas*, 204 F. Supp. 3d at 174 (quoting *United States v. Walton*, 814 F.2d 376, 379 (7th Cir. 1987)).

The court will therefore look to the efforts the Government did take to determine whether due diligence has been met.

### 2.   The Government's Due Diligence

Allam argues that the Government has "taken no steps" to pursue Allam's prosecution beyond its initial INTERPOL Diffusion. (Allam Mot. at 10-11.) He asserts that where there is no extradition treaty, the Government is still required to pursue informal methods but has failed to do so. For example, Allam points out that the Government took "numerous" efforts to extradite Khoury from Lebanon, but that none of those efforts are present here. (*Id.* at 3 n.1)[15]

The court notes that this is a different case and the court cannot merely compare the number of "acts" by the Government here and in *Khoury* to hold that the Government failed to move with reasonable due diligence in prosecuting Allam. For instance, it has not been six years which was the relevant time period in *Khoury. See Khoury*, 2019 WL 6687715, at *4. But regardless, in the six years of delay that the court considered in *Khoury*, the Government conferred with OIA, entered an arrest warrant into the NCIC database, and issued an INTERPOL Diffusion—which that court found was sufficient. *Id.* at *3. Allam is not a United

---

[15] As discussed *supra,* the court's analysis in *Khoury* only looked at the first six years of delay, instead of the full ten-year period. 2019 WL 6687715, at *4. At any rate, following the return of the sealed indictment, the Government in that case entered the defendant's arrest warrant into the NCIC database to alert border officials in the event the defendant attempted to re-enter the United States. *Id.* at *1. Four months later, the Government issued an INTERPOL Wanted Diffusion to twelve countries, not including Lebanon. *Id.* It wasn't until six years *after* that Diffusion, that the Government enter another Diffusion to the same twelve countries. *Id.* After another four years, the Government issued an INTERPOL Red Notice. *Id.*

States citizen so the Government could not enter his arrest warrant into a U.S. centered database when he has never even stepped foot on U.S. soil. Absent that act, which is inapplicable here, the efforts by the Government in both cases have been virtually the same for roughly the same time period.[16]

Further, the court finds that the Government's five-year delay in bringing Allam's case to trial was not deliberate in such a way as to hamper the defense. *Barker*, 407 U.S. at 531.

Counsel for Allam appeared to argue during oral argument that, even if not deliberate, the Government was at least negligent by not taking steps beyond the initial Diffusion such as through "refreshing Interpol communication." (Oral Argument Tr. at 8:12-17.) Defendant asserts that had the Government done so, this motion would be "dead on arrival." (*Id.*) However, in the Second Circuit, courts have found that "even if the government acted negligently, negligence does not weigh in favor of the defendant unless it actually lengthened the delay. That is because negligence is not a reason for the delay unless there is a causal connection." *Khan*, 575 F. Supp. 3d at 503 (emphasis in original). Here, Allam has failed to establish that causal connection. Where there is no history of successful extraditions of Lebanese citizens from Lebanon to the United States, and Allam has not

---

[16] The court takes note of the sparse declaration provided by Mr. Olson in this case as compared to the lengthy declaration provided in support of the Government's Opposition of co-defendant Chang's motion to dismiss. (*See* Olson Chang Decl.) However, that fact alone is not persuasive in this court's analysis. Therefore, reliance on Judge Rakoff's decision in *United States v. Khan*, 575 F. Supp. 3d 490, 502 (S.D.N.Y. 2021) is misplaced. Mr. Olson's declaration in *Khan* applied to a different defendant and a different extradition attempt. As discussed, the record in this case is devoid of evidence indicating Lebanon has ever extradited a Lebanese citizen to the United States. Thus, the fact that the Government conferred with OIA both in connection with this case, and in the past, and determined that extradition would be futile, was sufficient under the circumstances.

alleged any evidence that a formal request or "refresh" of the IN-TERPOL request would have brought Allam to the United States sooner, particularly where Allam refuses to travel in fear of his arrest to face these very charges, the court is "highly doubtful that the Government's failure to seek [Allam's] extradition from [Lebanon] actually lengthened the delay between his indictment and trial." *Id.*[17]

In sum, the court finds that the reason for the delay must weigh against the Defendant. *See, e.g., Nassimi*, 2023 WL 3584409, at *4 ("When, as here, the defendant has remained in a jurisdiction that will not extradite him, and the Government has been reasonably diligent in its efforts to apprehend him, the reason for the delay is appropriately attributed to the defendant.")[18]

---

[17] Co-defendant Jean Boustani's case also does not bear on the court's analysis. Pursuant to the arrest warrant that was issued for all Defendants in this case following the sealed Initial Indictment, Mr. Boustani was arrested on January 2, 2019 while in route to the Dominican Republic from his home country of Lebanon. (*See* January 8, 2019 Letter (Dkt. 21) at 1; Gov't Response to January 8, 2019 Letter (Dkt. 27) at 4.) These facts do not in any way suggest that the U.S. Government and the Lebanese Government worked in tandem to bring Boustani to the United States. Indeed, the Government's INTERPOL Diffusion issuance is aimed at the same result—that Allam will travel outside of Lebanon and be detained elsewhere so that the United States may extradite him.

[18] The court briefly addresses Allam's reliance on the voluntary dismissal by the Government in *United States v. Johnson*, No. 16-CR-457 (NGG), ECF No. 315 (E.D.N.Y. June 21, 2023). (Allam Reply at 7-8.) The facts of that case are not analogous or persuasive in the case at bar. In *Johnson*, the Government argued that it "exhausted extradition avenues," but the defendant showed "no sign of leaving the U.K. while charges against him [were] pending" giving the Government a "vanishingly small probability of securing [his] appearance" to "justify keeping this matter on the Court's docket." *Id.* at 3. In particular, there was only one remaining defendant in that case that could not be extradited, and it decided voluntary dismissal was warranted because it was unable to successfully access key witnesses and evidence, and in light of Supreme Court decisions that significantly impaired the ability for the prosecution to bring its case. *Id.*

### C.   Assertion of the Speedy Trial Right

Allam alleges that since the Initial Indictment was unsealed on March 6, 2019, he has been in active contact with the Government but that he is under no obligation to cooperate. (Allam Mot. at 13.) Nonetheless, on June 2, 2023, in seeking leave from this court to file the instant motion to dismiss, he asserts that he placed the Government on notice of his speedy trial rights. (*Id.;* Allam Request for Leave to File Mot.) In response, the Government argues that remaining in contact is not a substitute for promptly making a motion to dismiss to the court and in waiting four years to do so, this factor should weigh against him. (Gov't Opp. at 18.).

Even construing Allam's June 2, 2023 letter as an invocation of his speedy trial rights, it still does not support Allam's argument. (*See* Allam PMC Request.) This request came almost four years after the unsealing of the Initial Indictment charging Allam with conspiracy to commit fraud. "This is thus not an instance where the defendant has repeatedly and energetically asserted his rights." *Garcia Montalvo*, 862 F.2d at 426.

Accordingly, this factor weighs in favor of the Government.

### D.   Prejudice

Lastly, Allam argues that he has suffered prejudice due to significant anxiety and concern as a result of the Indictment because he is unable to travel outside of Lebanon for fear of arrest and the conditions in Lebanon are unstable, severe, and dangerous. (Allam Mot. at 15-17.) He further argues that his defense will be impaired because (1) witnesses' memories will be negatively impacted by the passing of time, and (2) critical documents and evidence will become more difficult to locate and access. (*Id.* at 17.)

The Government asks this court to find that Allam cannot assert prejudice where he refuses to bring himself to face a fair trial.

(Gov't Opp. at 20 (citing *Khoury*, 2019 WL 6687715, at *4 (prejudice from delay from defendant's decision to "remain[] in Lebanon purposely to evade prosecution . . . cannot be weighed in his favor").)

Even if the court determined that the economic turmoil and political crises facing Lebanon amount to prejudice for which he has no recourse, Allam would be unable to demonstrate that this factor weighs in his favor. The delay in this case has been caused by the Defendant's own choice to stay in his home country. Allam "has no serious interest in the speedy prosecution of the charges against him" where he refuses to leave Lebanon, not for fear of the events taking place there, but for fear of arrest in connection with this case. *Rayborn*, 858 F.2d at 92.

With regard to impairment of his defense, the most serious form of prejudice, Allam merely speculates that witnesses' memories will be impaired, and documents will be unattainable. (Allam Mot. at 17.) Courts in this Circuit have repeatedly held that such generalized arguments do not suffice for a showing of prejudice. *United States v. McGrath*, 622 F.2d 36, 41 (2d Cir. 1980) ("The professions of anxiety and concern, and of loss of witnesses' memory, are ephemeral."); *Brown v. Perez*, No. 13-CV-4615 (JPO), 2013 WL 5913306, at *16 (S.D.N.Y. Oct. 31, 2013), *report and recommendation adopted*, No. 13-CV-4615 (JPO), 2014 WL 5343309 (S.D.N.Y. Oct. 21, 2014) (collecting cases). While he points to the trial of his co-defendant as purported support, he does not allege that testimony was impaired or key witnesses died.

This court is therefore not persuaded and finds this factor also weighs against Allam.

### E.   Balancing of the *Barker* Factors

Though nearly five years passed since the return of the sealed Initial Indictment, the Government was reasonably diligent in its

efforts to prosecute Allam. Allam's failure to invoke his speedy trial right until nearly four years after the Initial Indictment was unsealed also weighs against him. While Allam is under no obligation to bring himself to trial, he cannot complain of a delay that he has caused living in his home country and free from prosecution. Accordingly, Allam's motion to dismiss the Indictment on speedy trial grounds pursuant to the Sixth Amendment is DENIED.

## VI.  RULE 48(B)

### A.  Chang's Motion to Dismiss Under Rule 48(b)

Chang contends that even if the court finds that the Government's conduct does not rise to the level of a constitutional violation, the court still has ample discretion to dismiss the Indictment under Rule 48(b).

However, for the reasons discussed, the court rejects this request. The Government was timely and diligent in initiating extradition proceedings and has been prompt and efficient in moving this case to trial following Chang's extradition. There has therefore been no unnecessary delay on the part of the Government warranting dismissal under Rule 48(b). *See, e.g., United States v. Yuan Qing Jiang*, 214 F.3d 1099, 1101 (9th Cir. 2000) (dismissal of an indictment under Rule 48(b) should be imposed "only in extreme circumstances . . . it requires findings of prosecutorial misconduct and actual prejudice to the accused"); *United States v. Ward*, 211 F.3d 356, 362 (7th Cir. 2000) (where there was no evidence of purposeful delay by the prosecution, district court did not abuse its discretion in denying motion to dismiss brought pursuant to Rule 48(b)).

Accordingly, Chang's motion to dismiss under Rule 48(b) is DENIED.

**B.  Allam's Motion to Dismiss Under Rule 48(b)**

In the case of Allam, the court finds that delay was due to Allam rather than the Government. Allam's motion to dismiss under Rule 48(b) is therefore also DENIED.

**VII. CONCLUSION**

For the foregoing reasons, the court DENIES both Defendants' motions to dismiss.


SO ORDERED.


Dated:      Brooklyn, New York
            December 21, 2023

                                    s/Nicholas G. Garaufis
                                    NICHOLAS G. GARAUFIS
                                    United States District Judge